## AFFIDAVIT IN SUPPORT SEARCH WARRANT

I, Jamie Frates, a Task Force officer ("TFO") with the Federal Bureau of Investigation ("FBI"), Kansas City, Missouri, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      As a TFO, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.  At all times throughout this affidavit, I use the terms "child sexual abuse material ("CSAM")" or "child pornography" merely as shorthand to refer to visual depictions of actual minors engaged in sexually explicit conduct.  I use the terms "visual depiction," "minor," and "sexually explicit conduct" as those terms are defined in 18 U.S.C. § 2256.

2.      I am currently employed as a detective with the Kansas City, Missouri Police Department and am serving as a TFO with the FBI.  I have been employed with the Kansas City, Missouri Police Department since July 2003, and am currently assigned to the FBI Child Exploitation Task Force, Kansas City, Missouri.  Since February 2022, I have been assigned to investigate computer crimes to include violations against children.  I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations.  These trainings have included instruction related to the laws against sexual abuse of minors, online applications used to entice children to produce sexually explicit material or engage in sexually explicit conduct with adults, and other subjects related to offenses committed against minor children.  I have assisted in the investigation of over 20 child pornography cases. During that time, I have had to view thousands of images of child pornography. I have previously applied the federal definition of child pornography used in this affidavit to multiple search warrant applications and a grand jury presentation.

1

3.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence and curtilage located at **218 W. 66th Terrace, Kansas City, Missouri 64113** (hereinafter the "**SUBJECT PREMISES**"), which is more particularly described in **Attachment A,** for the items specified in **Attachment B.**  I submit there is probable cause to believe that violations of 18 U.S.C. §§2252(a)(2) and (a)(4), that is possession, receipt, and distribution of child pornography, have occurred at the **SUBJECT PREMISES,** and that the evidence, fruits, contraband and instrumentalities of those violations are located at the **SUBJECT PREMISES**.

4.      The statements contained in this affidavit are based in part on information provided by law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training and background as a TFO with the FBI.  Since this affidavit being submitted for the limited purpose of showing that there is probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

## STATUTORY AUTHORITY

5.      This investigation concerns alleged violations of Title 18, United States Code, Sections 2252, relating to material involving the sexual exploitation of minors.   18 U.S.C. § 2252(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any visual depiction of minors engaging in sexually

2

explicit conduct when such visual depiction was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such visual depiction was produced using materials that had traveled in interstate or foreign commerce.

6.      18 U.S.C. § 2252(a)(2) prohibits a person from knowingly receiving or distributing any visual depiction of minors engaging in sexually explicit conduct in interstate or foreign commerce, by computer or mail.  Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to possess one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce or that were produced using materials that had traveled in interstate or foreign commerce.

## PROBABLE CAUSE

7.      On September 20, 2022, Affiant was conducting an online investigation on the BitTorrent network for offenders sharing CSAM.  Affiant directed his investigative focus to a device at IP address 136.32.143.253 because it was associated with torrents which were identified as having files of investigative interest to CSAM investigations.

8.      Using a computer running investigative BitTorrent software, Affiant directly connected to the device at IP address 136.32.143.253, hereinafter referred to as the "**Suspect Device.**" The **Suspect Device** reported that it was using BitTorrent client software uTorrent 3.5.5, and was sharing six separate torrents.  All six of the torrents referenced files that contained CSAM.

9.      One torrent had the info hash: 900fa025bfda9412cab4fe5e5d30e0b0b9654d42 and referenced 1 video file. Between 8:02 AM and 8:04 AM on September 20, 2022, the Affiant successfully completed the download of the single video file from the torrent that the **Suspect Device** was making available.  The video file was labeled with a title indicating CSAM related

3

contents. The video was six minutes in length and depicted a nude teenage female being tied, hand and leg to a chair, by an adult male. The child's buttocks and vagina were exposed. The adult male proceeded to engage in sexually explicit conduct with the teenage female.

10. A second torrent had the infohash: 36dc8649afd94666a4a8d0120b568cac19efe34a and referenced 353 files. Between 8:25 AM and 8:27 AM, Affiant successfully completed the download of approximately 353 image files from the torrent that the **Suspect Device** was making available. The images visually depicted prepubescent females engaging in the lascivious exhibition of their genitals and images of them touching each other's genitals, while others depicted adult men engaging in sexually explicit conduct with prepubescent females.

11. A third torrent had the infohash: a90137acfb43e98f4e2b339fd7ac3e77063cb39e and referenced 54 files. Between 8:27 AM and 8:28 AM, Affiant successfully completed the download of approximately 54 image files that the **Suspect Device** was making available. Several of the images visually depicted prepubescent females engaging in the lascivious exhibition of their genitals, and images of them touching and licking each other's genitals. One image depicted two prepubescent females in a shower one of whom had a pink phallic sexual device partially inserted into the other prepubescent female's anus.

12. Between October 4, 2022 and October 9, 2022, Affiant again directed his investigative focus to the **Suspect Device** because it was associated with additional torrents which were identified as having files of investigative interest to CSAM investigations.

13. On October 4, 2022, a torrent with the info hash: 90d73f669969bf746c7096aa0d622ed617db3fc3 referenced 52 files. Between 7:30 AM and 7:46 AM on October 4, 2022, Affiant successfully completed the download of the 20 files from the torrent that the **Suspect Device** was making available. Inside a folder was another folder labeled

4

which contained 19 images. Each of those images was a compilation of approximately 19 images. Most of the images visually depicted prepubescent and teenage females engaging in lascivious exhibition of their genitals and engaged in sexually explicit conduct with other prepubescent and teenage females. One video file depicted nude prepubescent females in beds and showers. It also showed a nude prepubescent female performing oral sex on an erect phallic sexual device that was strapped onto an unknown aged female. This file also had a "read me" file that explained how to order this "pack".

14.     On October 8, 2022 a torrent with the info hash: 18cb6437728460bf18a086d2957711372d20843f referenced 20 files. Between 11:54 PM on October 8, 2022 and 00:11 AM on October 9, 2022, Affiant successfully completed the download of the 20 files from the torrent that the **Suspect Device** was making available. Inside a folder containing the term "pedo" in the title were 10 video files and 10 image compilation files. One of the video files depicted an adult male engaging in sexually explicit conduct with an apparent nude female toddler. The video was 1:25 in length. Another video with the terms "5Yo" and "Fucking" in its title depicted multiple scenes of an adult male engaging in sexually explicit conduct with a female toddler.  The video was 3:45 minutes in length.

15.     On October 9, 2022, a torrent with the info hash: 279380147954b69da8a7dc2ff5a176fef76c6b33  referenced 16 files. Between 3:00 AM and 3:30 AM on October 9, 2022, Affiant successfully completed the download of the 16 files from the torrent that the **Suspect Device** was making available. Inside a folder with the term "Pedo" in its title were 8 video files and 8 image compilation files. One of the video files was a video compilation depicting multiple prepubescent, toddler, and infant children. At 11:17 minutes the video depicts an infant female child, with her vagina and buttocks exposed, and an unknown adult

5

digitally penetrating the infant's vagina while she appears to be passed out. The video is 1:03:47 in length.

16.    On November 8, 2022, Affiant again directed his investigative focus to the **Suspect Device** because it was associated with three additional torrents which were identified as having files of investigative interest to CSAM investigations.

17.    The first torrent had the info hash: 2ac3e7005bdf6d0d9ce1078f53e50af51932566c and referenced 432 files. Between 3:04 PM and 4:28 PM on November 8, 2022, Affiant successfully completed the download of over 100 video files from the torrent that the **Suspect Device** was making available with most depicting CSAM. One of the video files containing the term "8yo" in its title depicted a nude prepubescent female lying on a bed manipulating her exposed vagina. The scene stops then shows an adult male, nude from the waist down, rubbing his erect penis against the child's vagina. Another video depicted a prepubescent nude female in a bathtub performing oral sex on an adult male's erect penis. The video is approximately 38 seconds in length.

18.    The    second    torrent    had    the    infohash: c9b7f6e25b2db178bb4f89428e43dbc75e2ab949 and referenced 60 files from the torrent that the **Suspect Device** was making available. Between 3:09 PM and 4:26 PM, Affiant successfully completed the download of 60 files. Inside a folder with the terms "anal" and "fucking" in its title was a file folder that contained 57 image compilation files. The images visually depicted adult men engaging in sexually explicit conduct with prepubescent females, to include infants and toddlers. Another video depicts an infant child with an adult male erect penis penetrating the infant's anus. The video is 3:41 minutes in length.

19.    The third torrent had the infohash: 986043e0066637e7bff88926b792a5323a303a06

6

and referenced 445 files from the torrent that the **Suspect Device** was making available. Between 3:14 PM and 4:25 PM, Affiant successfully completed the download of 12 files. One of the video files labeled depicted an infant, nude from the waist down, with an adult male's penis rubbing against the infant's vagina. The scene then cuts to the infant being held by an adult who is digitally penetrating the infant's vagina. The video is 4:02 minutes in length.

20.     On Tuesday, December 20, 2022, Affiant again directed his investigative focus to the **Suspect Device** because it was associated with an additional torrent which was identified as having files of investigative interest to CSAM investigations.

21.     The torrent had the info hash: cad0a5546ddfc303c1d20021fecc7ca8328afd17 and referenced 87 files. Between 2:03 PM and 2:20 PM on December 20, 2022, Affiant successfully completed the download of the 85 files from the torrent that the **Suspect Device** was making available. Inside the folder with the terms "girls" and "sex" in its title was a sub-folder that consisted of 84 image compilation files. One of the image files was a collage of 19 images depicting a prepubescent female holding onto an erect adult male erect penis. The pictures then depict the female, nude from the waist down exposing her vagina, sitting on the adult male's penis. Another image file consisted of a collage of 19 images depicting a prepubescent female who is nude from the waist down with an adult male's penis partially inserted into her vagina. Another image file depicted a prepubescent female with a blind fold on and the words, "suck cock cum slut" written on the outside of the blind fold. The image also depicted the prepubescent female performing oral sex on an adult male's penis.

22.     The **Suspect Device** at IP Address 136.32.143.253 was the sole candidate for the downloads referenced above, and as such, each file was downloaded directly from this IP Address.

23.     On October 18, 2022, Affiant conducted a query through MAXMIND, a digital

mapping company that provides location data for IP addresses. MAXMIND reported that the **Suspect Device** at IP Address 136.32.143.253 was registered to Google Inc. with a possible geo-location address in or near Kansas City, Missouri.  An administrative subpoena was served upon Google Inc., for subscriber information

24.     On November 17, 2022, Google's response indicated that the subscriber information for IP address 136.32.143.253 was as follows: Melinda Kevis, **218 W. 66th Terrace, Kansas City, Missouri 64113-1855**.  The primary email address was to Melinda Kevis with an alternate email listed to Ivan Helmrich.  The account activation date was on March 31, 2022.  The first timestamp for the exact IP address was on March 31, 2022, and the last date stamp was November 2, 2022.

25.     Open-source database searches revealed Peter N. Helmrich, with a date of birth of December 31, 1993, social security number xxx-xx-0672, was also associated with the **SUBJECT PREMISES**.  Peter Helmrich's Missouri Driver's License listed the **SUBJECT PREMISES** as his residence.  Additional database searches indicated additional current residents including his father, Ivan B. Helmrich, born in 1957, and his mother/stepmother, Melinda Kevis born in 1950.  Publicly accessible records listed Ivan Helmrich and Melinda Kevis as the current owners of the **SUBJECT PREMISES**.

26.     On December 1, 2022, Affiant conducted physical surveillance in the vicinity of the **SUBJECT PREMISES** and observed a 2006 Ford Ranger, bearing Missouri license plate #6SD P55, parked on the street in front of the **SUBJECT PREMISES,** just west of the driveway. This vehicle was registered to Ivan Helmrich, with his residence listed as **218 W. 66th Terrace, Kansas City, Missouri**.  Another vehicle, a 2016 Subaru Outback, bearing Missouri license plate #LC7 V2Y, was parked in the driveway of the **SUBJECT PREMISES**.  This second vehicle was

8

registered to Melinda Kevis, with her residence listed as **218 W. 66th Terrace**. All visible Wi-Fi Internet networks in the immediate surrounding area of the **SUBJECT PREMISES** showed to be password protected.

27. On December 2, 2022, your Affiant conducted physical surveillance in the vicinity of the **SUBJECT PREMISES** and observed the 2006 Ford Ranger and the Subaru parked in the same spot as the previous surveillance. Another vehicle, a 2014 Chevrolet Sonic, bearing Missouri license plate #RE8 K0P, was parked on the street in front of the **SUBJECT PREMISES,** just east of the driveway. This vehicle was registered to Ivan Helmrich and Peter Helmrich, with his residence listed as **218 W. 66th Terrace Kansas City, Missouri**. Affiant observed Peter Helmrich exit the front door of the residence, get into the Chevrolet Sonic, and drive away.

28. On December 20, 2022, Affiant sent an email to the United States Postal Inspector, for the Kansas City Domicile, requesting information regarding packages that had been sent to the address of **218 W. 66th Terrace, Kansas City, Missouri, 64113**. The Postal Inspector responded that packages addressed to Peter Helmrich, Ivan Helmrich, and Melinda Kevis had been delivered to the **SUBJECT PREMISES** as far back as September 23, 2022 and as recently as December 19, 2022.

29. On December 27, 2022, Affiant conducted another physical surveillance in the vicinity of the **SUBJECT PREMISES** and observed the blue Ford Ranger, the Subaru Outback, and the blue Chevrolet Sonic parked at the residence. Affiant was able to see Ivan Helmrich through the front window of the residence, along with another male that appeared to be the same height and appearance of Peter Helmrich.

30. On Monday, January 4, 2023, Affiant again directed his investigative focus to the **Suspect Device** because it was associated with two additional torrents which were identified as

having files of investigative interest to CSAM investigations.

31.     The first torrent had the info hash: c8c83665922bd50034faaa1fcdc2dc6e3c0f6080 and referenced 2 files. Between 4:59 AM and 5:08 AM on January 4, 2023, the Affiant successfully completed the download of 2 files from the torrent that the **Suspect Device** was making available with most depicting CSAM.  One of the files with the terms "2yo girl" in its title contained an image consisting of 47 images of a female toddler in different poses with her vagina exposed and some depicting an adult male's erect penis partially inserted into the toddler's vagina.

32.     The second torrent had the info hash: ef0e191e55dfed3ff4cd977b6907e8e83a07724a and referenced 8 files. Between 5:09 AM and 6:02 AM on January 4, 2023, the Affiant successfully completed the download of 5 files from the torrent that the **Suspect Device** was making available with all files depicting CSAM. Inside one of the folders were five video files.  Video file "1" depicted a prepubescent female lying down with a dress on. It then showed an adult male pulling up her dress and rubbing his penis against her vagina over her underwear. The video then depicted the male removing the female's underwear and partially inserting his penis into her vagina. The video ends with the adult male ejaculating into the prepubescent female's mouth. This video was 7:04 minutes in length.

## **DEFINITIONS**

33.     The following definitions apply to this Affidavit and to **Attachment A** to this Affidavit:

>     a.      "Child Erotica," as used herein, means materials demonstrating a sexual interest in minors, including fantasy narratives, cartoons, and books describing or alluding to sexual activity with minors, sexual aids, children's clothing catalogues, and child modeling images.

b.        Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.        "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices.  *See* 18 U.S.C. § 1030(e)(1).

d.        "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e.        "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

f.        "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

g.        "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly

11

includes programs to run operating systems, applications, and utilities.

h.      "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

i.      The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

k.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

l.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

m.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

n.      "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

o.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

12

p.      A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

q.      "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

r.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

s.      A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

t.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard  disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON COMPUTERS, CELL PHONES, AND CHILD PORNOGRAPHY

34.      Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.  Child pornography formerly was produced using cameras and film (either still photography or movies).  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  There were definable costs involved with the production of pornographic images.  To

13

distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

35.     The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

36.     With the advent of digital cameras and cell phones, images can now be transferred directly from a smart phone onto a computer. Images can also be also be transferred from a computer to a smart phone. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

37.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

38.     A smartphone, or smart phone, is a mobile phone with more advanced computing capability and connectivity than basic feature phones. Early smartphones typically combined the features of a mobile phone with those of another popular consumer device, such as a personal digital assistant (PDA), a media player, a digital camera, or a GPS navigation unit. Modern smartphones include all those features plus the features of a touchscreen computer, including web browsing, Wi-Fi capability, and apps. Frequently, smartphones also include removable storage devices, or SD cards, where users can store data, including picture and video files.

14

39.     Smart phone technology has expanded computer capability in recent years by allowing users to access the Internet via their phone. The smart phone user can search the Internet for specific files, check personal email accounts, log on to social networking sites, communicate with other computer users, compose and edit documents, and store and view movie and picture files.

40.     The Internet and its World Wide Web afford collectors of child pornography several different venues and social media platforms for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

41.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as cloud storage, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.

42.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such

15

information is often maintained indefinitely until overwritten by other data. Even when users delete data, remnants or evidence of that data may still remain within the computer data.

43. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, evidence of child pornography can be found on the user's computer in most cases.

## TECHNICAL INFORMATION REGARDING P2P SOFTWARE AND BITTORRENT

44. Peer to Peer (P2P) file sharing allows people using P2P software to download and share files with other P2P users using the same or compatible P2P software. P2P software is readily available on the Internet and is often free to download. Internet connected devices such as computers, tablets and smartphones running P2P software form a P2P network that allow users on the network to share digital files. BitTorrent is one of many P2P networks. For a user to become part of the BitTorrent network, the user must first obtain BitTorrent software and install it on a device. When the BitTorrent software is running and the device is connected to the Internet, the user will be able to download files from other users on the network and share files from their device with other BitTorrent users.

45. Users of the BitTorrent network wishing to share new content will use a BitTorrent program to create a "torrent" file for the file or group of files they wish to share. A torrent file is a small file that contains information about the file(s) and provides a method for a user to download the file(s) referenced in the torrent from other BitTorrent users. Torrent files are typically found as the result of keyword searches on Internet sites that host or link to them. Torrent files may be referenced by their "info hash", which uniquely identifies the torrent based on the file(s) associated with the torrent file.

16

46.     To download file(s) from other users on the BitTorrent network, a user typically obtains a torrent file.  The BitTorrent software processes the information in the torrent file and locates devices on the BitTorrent network sharing all or parts or the actual file(s) being sought. The download of the content referenced in the torrent is achieved after the requesting computer and the sharing computer(s) directly connect to each other through the Internet using the BitTorrent software.

47.     Third party software is available to identify the IP address of the P2P computer sending the file and to identify if parts of the file came from one or more IP addresses. Such Software monitors and logs Internet and local network traffic.

**SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS**

48.     Searches and seizures of evidence from cellular phones commonly require agents to download or copy information from the cellular phone to be processed later in a laboratory or other controlled environment.  This is almost always true because of the following:

a.     Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or

17

normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

49.     In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any application software that may have been used to create the data (whether stored on hard drives or on external media).

## SEARCH METHODOLOGY TO BE EMPLOYED

50.     The search procedure of electronic data contained in computer hardware, computer software, memory storage devices, and/or cell phones may include the following techniques (the following is a nonexclusive list, as other search procedures may be used):

a.     examination of all of the data contained in such computer hardware, computer software, memory storage devices, and/or cell phone to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.     surveying various file directories and the individual files they contain;

d.     opening files in order to determine their contents;

e.     scanning storage areas;

18

f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in **Attachment B**; and/or

g.      performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in **Attachment B**.

## CHARACTERISTICS COMMON TO INDIVIDUALS INVOLVED IN THE DISTRIBUTION, RECEIPT, OR POSSESSION OF CHILD PORNOGRAPHY OR IN ATTEMPTS TO COMMIT THOSE CRIMES

51.      As set forth above, probable cause exists to believe that one or more individuals residing at the **SUBJECT PREMISES** has distributed, received or possessed child pornography, or has conspired or attempted to commit these crimes.  Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals involved in such crimes:

a.      Those who distribute, receive or possess child pornography, or who conspire or attempt to commit these crimes may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.      Those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Such individuals oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes often possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, videotapes, magazines, negatives, photographs, correspondences, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  **These**

19

**individuals typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.**

d.　Likewise, those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. **These collections are often maintained for several years and are kept close by, usually on their property including external garages and outbuildings, to enable the collector easier access to view the collection, which is valued highly.**

e.　Those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individual with whom they have been in contact and who share the same interests in child pornography.

f.　**Those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.**

## **CONCLUSION**

52.　Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause to believe that one or more individuals who reside at the **SUBJECT PREMISES**, more fully described in **Attachment A**, is involved in the distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2252 (a)(2) and (a)(4).[1] Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violations of 18 U.S.C. §§ 2252 (a)(2) and (a)(4) (distribution, receipt, and possession of child

---

1 In Affiant's experience, multiple occupants of a single residence tend to share access to Internet connections, in particular Wi-Fi connections, thus making it possible that any Internet capable device located within the Subject Premises could have been the Suspect Device in this case.

pornography), is located in the residence described above (the **SUBJECT PREMISES**), and this evidence, listed in **Attachment B** to this affidavit, is contraband or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

53.     Your Affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search of the **SUBJECT PREMISES** described in **Attachment A** and seizure and search of the items listed in **Attachment B**.

_____
Jamie Frates
Task Force Officer
Federal Bureau of Investigation


Sworn and subscribed to me by telephone on this ___10th___ day of January 2023.  Sworn to by telephone
9:53 AM, Jan 10, 2023

_____
HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Western District of Missouri



21